## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| CHARLES VELDEKENS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-06-3296 |
| | § | |
| | § | |
| GE HFS HOLDINGS, INC., *et al.*, | § | |
| | § | |
| Defendants. | § | |

### MEMORANDUM AND ORDER

This is a breach of contract and wrongful foreclosure case arising from a loan guaranty.  The defendants, GE HFS Holdings, Inc., Heller Healthcare Finance, Inc., and HCFP Funding II, Inc. (together referred to as "GE HFS"), loaned approximately $18 million in 1998 and 1999 to a partnership, Doctors Hospital 1997, L.P., to provide funds to renovate and expand a hospital.  The partnership leased the hospital from Charles and Ashraf Veldekens, who signed a limited guaranty for the loans.  This litigation involves the foreclosure by GE HFS on the hospital after the partnership declared bankruptcy.  The following motions are pending:

- GE HFS has moved for summary judgment.  (Docket Entry No. 33).  The plaintiffs have responded and filed a cross-motion.  (Docket Entry No. 37).  GE HFS has replied, (Docket Entry No. 38), and responded to the plaintiffs' cross-motion, (Docket Entry No. 40).  The plaintiffs have replied. (Docket Entry No. 41).

•       GE HFS has also moved to strike certain portions of Charles Veldekens's affidavit. (Docket Entry No. 40). The plaintiffs have responded, (Docket Entry No. 41), and GE HFS has replied, (Docket Entry No. 44).

Based on the pleadings, the motions, responses, and replies, the parties' submissions, and the applicable law, this court grants in part and denies in part GE HFS's motion for summary judgment, denies the plaintiffs' motion for summary judgment, and denies as moot the motion to strike the affidavit of Charles Veldekens. The reasons are explained below.

## I. Background

### A. The Summary Judgment Evidence

#### 1. The Original Construction Loan

Between 1992 and 1997, Charles and Ashraf Veldekens owned and operated the hospital at issue, located at 510 West Tidwell, as the Yale Clinic & Hospital. In 1997, HealthPlus Corporation approached the Veldekens about buying or leasing the hospital. (Docket Entry No. 33, Ex. 6 at 235:2-6). On January 25, 1998, the Veldekens entered into a twenty-year Lease Agreement for the hospital with Doctors Hospital, 1997, L.P., a limited partnership in which HealthPlus was the general partner. (*Id.*, Ex. 3A). Under the Lease Agreement, the Veldekens acquired a 5% partnership interest in Doctors Hospital and two seats on the hospital's Governing Board. (*Id.*, Ex. 3A at 33–34). The hospital was renamed Doctors Hospital Tidwell. The Lease Agreement contemplated that Doctors Hospital would obtain a loan to renovate and expand the hospital (the "Construction Loan"). In the Lease Agreement, the Veldekens agreed to guarantee the Construction Loan, stating that they

2

would use their "best efforts . . . to satisfy any and all commercially reasonable requests" by the lender, including authorizing a lien or mortgage of up to $7 million to be placed on the hospital. (*Id.*, Ex. 3A § 12.1). Doctors Hospital agreed to "use its commercially reasonably [sic] best efforts" to obtain the lender's agreement to "pursue its remedies against HealthPlus and [Doctors Hospital] before foreclosing" on any lien against the hospital and to apply the first principal payments under the loan to reducing any such lien. (*Id.*, Ex. 3A § 12.5). The Lease Agreement also contained a noncompete provision. Doctors Hospital agreed not to "own, manage, operate, control, participate in the management or control of, be employed by, maintain or continue any interest whatsoever in, any enterprise which is engaged in the operation of a general acute care hospital within a three (3) mile radius" of the Tidwell hospital. (*Id.*, Ex. 3A § 20.2).

Seven months later, on July 27, 1998, Doctors Hospital obtained the Construction Loan from GE HFS in the amount of $7 million. The loan terms and security were set out in documents all executed on the same day – July 27, 1998 – and referring to each other (collectively, the "Loan Documents"). The Loan Documents included: the Loan Agreement, signed by Doctors Hospital and GE HFS (*id.*, Ex. 4A); an Unconditional Guaranty of Payment and Performance, signed by HealthPlus, a HealthPlus subsidiary called "North Houston HealthPlus, L.L.C." ("North Houston"), and GE HFS (Docket Entry No. 37, Ex. 2, exhibit E); a Limited Guaranty Agreement, signed by the Veldekens and GE HFS (Docket Entry No. 33, Ex. 2); and a Deed of Trust and Security Agreement, signed by Doctors Hospital, the Veldekens, and GE HFS (*id.,* Ex. 3A).

3

The Loan Agreement stated that the $7 million Construction Loan was to be used "solely and exclusively" for construction work at the Tidwell hospital.  (*Id.*, Ex. 4A § 4.13 & exhibit D).  The Loan Agreement also set out a disbursement procedure under which Doctors Hospital was required to submit project budgets to GE HFS before receiving funds.  (*Id.*, Ex. 4A § 2.10(a)).  Additional disbursements were contingent on the satisfactory completion of previously funded project items.  Satisfactory completion was to be verified by an inspector for GE HFS.  (*Id.*, Ex. 4A § 2.10(b)).  The Loan Agreement further provided:

> The maximum amount of any advance of Loan proceeds shall equal allowable nonconstruction expenses actually incurred within the amounts set forth in the Budget, plus the lesser of (a) the actual cost of the completed portion of the Project Work, or (b) the scheduled value of each completed portion of the Project Work . . . . No advances shall be made for duplicated work for which Loan funds were previously advanced, work that does not conform to the Plans and Specifications, or work that is unsatisfactory to the Inspector.

(*Id.*, Ex. 4A § 2.10(c)).

The Unconditional Guaranty of Payment and Performance identified HealthPlus and North Houston as guarantors of the Construction Loan.  (Docket Entry No. 37, Ex. 2, exhibit E).  The Limited Guaranty Agreement identified the Veldekens as additional guarantors of the Construction Loan.  The Limited Guaranty Agreement secured the Veldekens' guaranty obligations through a lien on the Tidwell hospital.  (Docket Entry No. 33, Ex. 2).  The Limited Guaranty Agreement recited that the Veldekens had agreed to serve as guarantors in consideration for the "substantial benefits and increase in value" to their property that would result from the improvement and renovations to the Tidwell hospital under the

Construction Loan.  (*Id.*, Ex. 2, recitals D, E).  This Agreement also provided that the Veldekens' guaranty would apply only to the Construction Loan and "not to any other indebtedness of [Doctors Hospital] to Lender . . . ."  (*Id.*, Ex. 2 ¶ 7).

Under the Limited Guaranty Agreement, the Veldekens expressly agreed to, and waived notice of, most changes to the loan terms.  The Veldekens also waived notice of changes to Doctors Hospital's financial condition:

> 4.     The Guarantor hereby waives notice of the acceptance of this Guaranty and of the extending of credit as above specified and the state of indebtedness of Borrower at any time, and expressly agrees to any extensions, renewals, accelerations or modifications of such credit or any of the terms thereof (but not increases in the amount of credit or extensions of the maturity of the Note post the expiration date of the Lease, unless Guarantor consents to such increases), and, except as provided in the Mortgage and in this Guaranty, waives diligence, presentment, demand or payment, protest or notice, whether of non-payment, dishonor, protest or otherwise of any document or documents and notice of any extension, renewal, modification or default and assent to the release, substitution or variation of any collateral that may at any time be held as security for any credit extended to Borrower, all without relieving Guarantor of any liability under this Guaranty.
> . . .
> 16.     Guarantor hereby assumes responsibility for keeping itself informed of the financial condition of the Borrower . . . and of all other circumstances bearing upon the risk of nonpayment of the Loan or any part of the Loan that diligent inquiry would reveal, and Guarantor hereby agrees that, except as provided in the Mortgage, Lender shall have no duty to advise Guarantor of information known to Lender regarding such condition or any such circumstances. . . .

(*Id.*, Ex. 2 ¶¶ 4, 16).

The Deed of Trust and Security Agreement reiterated many of Limited Guaranty provisions and defined the lenders' lien.  Under the Deed of Trust, the Veldekens conveyed their "fee simple interest" and Doctors Hospital conveyed its "leasehold interest" in the "Mortgaged Property" as security for the Construction Loan.  (*Id.*, Ex. 1A at 2).  The Deed of Trust defined the "Mortgaged Property" as "all of Grantor's present and future right, title and interest in and to," among other items, the land, appurtenant rights, improvements, fixtures, rents, leases, and proceeds of or from the hospital.  (*Id.,* Ex. 1A at 6-7).  "Grantor" was defined as "the Leasehold Grantor together with its successors and permitted assigns, unless otherwise indicated herein."  (*Id.,* Ex. 1A at 5).  The definitions section of the Deed of Trust identified Doctors Hospital as the "Leasehold Grantor" and the Veldekens as the "Fee Grantor."  (*Id.,* Ex. 1A at 4, 6).  The signature pages to the Deed of Trust referred to Doctors Hospital and the Veldekens collectively as "Grantors."  (*Id.*, Ex. 1A at 33-34).

The Deed of Trust required that GE HFS provide the Veldekens "with the same written notice of default and right to cure which [GE HFS] provides [Doctors Hospital] in the case of an Event of Default."  (*Id.*, Ex. 1A § 15(o)).  The Deed of Trust also gave GE HFS discretion in structuring its remedies in the event of default.  The Deed of Trust included the following statement:

> [GE HFS] shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this Instrument, the Note, any other Loan Document or applicable law. [GE HFS] shall have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of such remedies. . . .

(*Id.*, Ex. 1A § 20).

### 2.    The First Amendment to the Loan Agreement

On September 21, 1998, nine months after signing the original Lease Agreement and less than two months after signing the Construction Loan Documents, the Veldekens and Doctors Hospital signed the First Amendment to the Lease Agreement.  This amendment increased the authorized lien amount from $7 million to $12 million.  (*Id.*, Ex. 3B § 1).  It also added an amendment that allowed Doctors Hospital "at any time and from time to time to refinance or rearrange its indebtedness secured by liens on the Leased Assets."  (*Id.*, Ex. 3B § 2).

The First Amendment to the Lease Agreement included a new section entitled "Monitoring of Operations."   This section provided that one of the Veldekens' representatives on the Governing Board would be the Veldekens' son, Victor Veldekens. (*Id.*, Ex. 3B § 4).  Victor Veldekens was to receive a $5,000 monthly director's fee for this role.  (*Id.*).  Meeting minutes from the governing board indicate that Charles Veldekens or Victor Veldekens attended meetings at which construction updates were given on May 13, June 10, July 8, and September 23, 1998 and on January 20, 1999.  (*Id.* at Exs. 10, 11, 12, 13, 14).

The First Amendment to the Lease Agreement also included a new clause stating that the loan funds would be spent only on the Tidwell hospital:

> 15.6    Use of Loan Proceeds.  Lessee shall utilize all advances
> made to it by Lessor's secured lender which are secured by liens
> on the leased Assets for, and only for, the payment or

>reimbursement of those costs and fees that lessee's secured lender shall have approved of legitimately relating to the cost of constructing and/or renovating the improvements in, on and about the Property and under no circumstances shall Lessee use any portion of the loan proceeds for any other purpose, including specifically, but without limitation, for the defrayment of Lessee's business expenses or the anticipation of profit to lessee (except that any such proceeds used to reimburse Lessee for expenses previously incurred by Lessee in constructing and/or renovating the improvement may be then used by lessee in its business and operations).

(*Id.,* Ex. 3B § 3).

On November 6, 1998, GE HFS and Doctors Hospital signed a First Amendment to Loan Agreement, which increased the loan amount to $12 million.  (*Id.,* Ex. 4B § 2).  This amendment included a new cross-default provision that made a default on any other "note, instrument, loan agreement or security instrument" between GE HFS and Doctors Hospital an "Event of Default" under the construction loan.  (*Id.*, Ex. 4B § 12).

On the same day, the Veldekens and Doctors Hospital signed the First Amendment to Deed of Trust and Security Agreement.  This amendment increased the Veldekens' guaranty on the debt to $12 million.  (*Id.*, Ex. 1B § 2).

### 3.    The Parkway Hospital Acquisition

In June 1999, HealthPlus purchased Columbia North Houston Medical Center (the "Parkway hospital"), located two miles from the Tidwell hospital, for $7 million.  (Docket Entry No. 37, Ex. 14 at 1).  GE HFS provided financing for the purchase.  (*Id.*).  An internal memorandum for HealthPlus's Credit Committee stated that this loan was secured with a lien on the Parkway hospital and was "cross-collateralized" by the Veldekens' mortgage on the

Tidwell hospital.  (*Id.*).  HealthPlus expected the Parkway hospital acquisition to alleviate

space problems caused by "growth in both patient volume and services provided" at the

Tidwell hospital.  (*Id.,* Ex. 14 at 2).  HealthPlus also expected the acquisition to result in

savings at the Tidwell hospital by combining and consolidating certain services and

departments provided at both the Tidwell and Parkway hospitals.  The HealthPlus internal

memorandum stated:

> In an effort to accommodate the additional patient volume and
> services, Tidwell was in the process of completing a $12 MM
> construction and renovation project.  The project consists of (i)
> $4.0MM for the construction of an LTACH, (ii) $4.0MM for a
> 10-bed intensive care unit, (iii) $1.0MM for a heart and catheter
> lab, (iv) $1.0MM for the build out of two operating room units,
> and (v) $2.0MM for first floor renovations which would provide
> an additional 87 beds, for a cost savings of $5.0MM.  Additional
> cost savings include (i) the elimination of duplicative
> department heads ($600M-$1.0MM), (ii) the consolidation of
> the OBGYN departments ($500M), and (iii) the sale of two
> vacant lots not used by Tidwell ($480M).  Total cost savings for
> HealthPlus as a result of this transaction approach $7.0M.

(*Id.*).

### 4.      The Second Amendment to the Loan Agreement

On July 8, 1999, GE HFS and Doctors Hospital signed a Second Amendment to Loan

Agreement, which stated that GE HFS would make an additional advance of $2 million  to

Doctors Hospital. (Docket Entry No. 33, Ex. 4C § 3.1).  The Second Amendment stated that

a $10 million principal balance remained outstanding on the Construction Loan.  The $2

million advance would raise the principal indebtedness to $12 million, which was permitted

by the First Amendment to Loan Agreement.  (*Id.*, Ex. 4C §§ 2, 3.1).  The Second

Amendment to Loan Agreement replaced the cross-default provision inserted into the First

Amendment to Loan Agreement with a new cross-default clause:

> Section 6.1 of the Loan Agreement is hereby amended by deleting subparagraph (l) and inserting a new subparagraph (l) as follows: (l) The occurrence of any Event of Default under (1) that certain Secured Term Notice dated July ___, 1999 made by Borrower and HealthPlus payable to Lender's Affiliate in the principal amount of $1,000,000, as the same may be amended, modified and restated from time to time (collectively, the "Term Note"); 2) that certain letter agreement dated July ___, 1999 made by and among Lender, Borrower and Guarantors with respect to an additional advance of Loan proceeds in the principal amount of $2,000,000 (as amended, modified and restated from time to time, the "Tidwell Letter Agreement"); or 3) any other note, loan agreement, guaranty or other instrument or agreement executed and delivered by Borrower, HealthPlus, any Guarantor or any affiliate or subsidiary of any such party in connection with any other financing provided by Lender or Lender's Affiliate, whether now existing or hereinafter arising.

(*Id.*, Ex. 4C § 3.4).

On the same day, GE HFS, Doctors Hospital, and HealthPlus executed a letter

agreement on the additional $2 million loan. This letter agreement stated that Doctors

Hospital would obtain the Veldekens' consent to the Second Amendment to Loan Agreement

within forty-five days:

> No later than forty five (45) days after the date of this Agreement, the Borrower shall cause to be delivered to Lender satisfactory written evidence of the consent of Charles Veldekens and Ashraf Veldekens to the provisions of this Agreement and the transactions contemplated herein. The Borrower's failure to deliver such evidence in accordance with this Section shall constitute an immediate Event of Default under the Loan Agreement.

10

(*Id.*, Ex. 4C § 8).

### 5.   The Consolidation of HealthPlus's Loans

On the following day, July 9, 1999, HealthPlus entered into an agreement with GE HFS to consolidate certain loans, including the Construction Loan and the Parkway hospital acquisition loan.  (Docket Entry No. 37, Ex. 17 at 1).  On September 16, 1999, after reviewing the consolidation documents, Dean Graham, a Senior Vice President at Heller, wrote to HealthPlus stating that "the execution of one consolidated note would probably require the consent of the Veldekens since we would technically be increasing the original Construction Note." (*Id.*).  Graham added: "We understand that you are currently negotiating with the Veldekens to increase the amount secured by the Tidwell Deed of Trust, but that you have not yet reached a definitive agreement.  In light of the pending negotiations, it would probably not be helpful at this time to request their consent to the consolidation of the term debt."  (*Id.*).  Graham concluded that the consolidation would be "effective immediately," but agreed "to document these changes in the future at such time as you are able to obtain the consent of the Veldekens."  (*Id.*, Ex. 17 at 2).

### 6.   The Memorandum of Agreement and Additional Term Note

During this period, the Veldekens, Doctors Hospital, and HealthPlus disputed several matters related to the Construction Loan.  The disputes included HealthPlus's acquisition of the Parkway hospital, which violated the Lease Agreement's noncompete clause.  (Docket Entry No. 33, Ex. 15 at 52:15-54:16).  On October 18, 1999, the Veldekens, Doctors Hospital, and HealthPlus signed a Memorandum of Agreement in which the Veldekens

consented to increase the lien on their property from $12 million to $19 million, provided that the entire $7 million increase was to be "used to pay for improvements or reimburse Doctors Hospital for improvements to Veldekens' leasehold property and shall include, at least, the completion of the emergency care facility and the intensive care facility." (*Id.*, Ex. 8 ¶ 4). The Veldekens also consented to the purchase of the Parkway hospital. (*Id.*, Ex. 8 ¶ 8). Doctors Hospital agreed to provide the Veldekens with annual audited financial statements for the Tidwell hospital's operations and with written authorization to contact any lender having a security interest in the Tidwell hospital "to make reasonable inquiries and to determine performance upon the terms and conditions of all such loans." (*Id.*, Ex. 8 ¶¶ 6, 9). On December 9, 1999, these provisions were memorialized in the Second Amendment to Lease Agreement, which the Veldekens and Doctors Hospital signed. (*Id.*, Ex. 3C ¶¶ 4, 5).

On December 22, 1999, the Veldekens signed the Second Amendment to Deed of Trust and Security Agreement, which increased the amount of debt secured by the Deed of Trust from $12 million to $19 million. (*Id.*, Ex. 1C § 2). The same day, Doctors Hospital and Heller signed a Secured Term Note and Security Agreement for an additional loan of $6 million (the "Additional Term Note"). (Docket Entry No. 37, Ex. 19). Through a separate letter agreement, Doctors Hospital and Heller agreed that Doctors Hospital would receive $3 million of the funds in reimbursement for equity spent on construction at the Tidwell hospital. Doctors Hospital promptly used that money to repay $3 million of the $7 million note used to acquire the Parkway hospital. (*Id.*, Ex. 19 at 31-32; Ex. 20 at 1-2).

### 7. Bankruptcy and Foreclosure

On December 23, 1999, the Veldekens transferred their title to the Tidwell hospital through warranty deed, for $10, to an entity called Tidwell Properties, Inc. (Docket Entry No. 33, Ex. 16). Charles Veldekens was the registered agent and sole officer and director of Tidwell Properties, Inc.

In the following years, the Veldekens made several complaints to HealthPlus and its counsel about the status of construction on the Tidwell hospital, the use of loan proceeds, and HealthPlus's refusal to provide certain financial statements and audit reports. *See* letters dated August 11, 2001 (*id.*, Ex. 24); March 16, 2003 (*id.,* Ex. 30); and May 1, 2003 (*id.*, Ex. 31). Beginning on December 1, 2004, Doctors Hospital stopped making its monthly lease payments to the Veldekens. (Docket Entry No. 40, Exs. 42, 43).

On March 9, 2005, the Veldekens filed suit against Doctors Hospital, North Houston, HealthPlus and GE HFS in Texas state court. The petition included allegations of wrongful disbursement and misapplication of funds under the Loan Agreement and sought to evict Doctors Hospital from the Tidwell hospital property for nonpayment of rent. *See Veldekens v. Doctors Hosp. 1997, L.P.,* No. 2005-16310 (164th Jud. Dist. Ct., Harris County, Tex.).

On April 6, 2005, Doctors Hospital filed for Chapter 11 bankruptcy. On September 12, 2005, GE HFS sent the Veldekens a Notice of Default, demanding payment of the outstanding balance on the Tidwell hospital loans, over $15 million. (Docket Entry No 33, Ex. 37). On September 30, 2005, GE HFS removed the state-court case to federal district court, which referred it to the bankruptcy court.

On November 10, 2005, GE HFS sent the Veldekens notice that the Tidwell hospital would be sold at public auction on December 6, 2005 unless full payment of the loans was received. (*Id.,* Ex. 38). The plaintiffs filed a first amended complaint in the bankruptcy court in November 2005. That complaint asserted causes of action for breach of contract, a claim to quiet title, negligent misrepresentation, unjust enrichment, violations of the Texas Deceptive Trade Practices Act, breach of fiduciary duty, theft of property, breach of express warranty, aiding and abetting, conspiracy, principal–agent liability, wrongful foreclosure, and conversion. The plaintiffs also sought to enjoin GE HFS's right to foreclose on the hospital. The plaintiffs alleged that GE HFS had a duty to monitor the hospital renovations when it disbursed the loan proceeds, that it had failed to do so, and that loan proceeds had been misapplied to purposes other than renovation work. *In re Doctors Hosp. 1997, L.P.*, No. 05-35291 (Bkrtcy S.D. Tex. 2005).

GE HFS moved to dismiss the amended complaint on the basis of limitations, among other grounds. In response, the plaintiffs abandoned certain of their claims. The bankruptcy court denied GE HFS's motion to dismiss but entered an order stating that the plaintiffs were limited to the claims that they had not abandoned as of the start of the evidentiary hearing set for November 15, 2005.

After the evidentiary hearing, the bankruptcy judge denied the plaintiffs' request for a temporary injunction to prevent foreclosure. On December 6, 2005, GE HFS sold the Tidwell property at a public foreclosure auction to a GE HFS subsidiary for $2.5 million.

(Docket Entry No. 46 ¶ 35).  On June 30, 2006, the Tidwell property was conveyed back to the reorganized Doctors Hospital for $2.5 million in return for new secured debt.  (*Id.*).

In 2006, GE HFS moved for summary judgment in the bankruptcy court, again asserting limitations.  The plaintiffs' motion to withdraw the reference was granted and the case was later transferred to this court.

### B.    The Second Amended Complaint and the Summary Judgment Arguments

In May 2007, the plaintiffs had moved for leave to file a second amended complaint. (Docket Entry No. 17).  This court granted the plaintiffs' motion for leave to amend as to counts one through thirteen of the proposed second amended complaint because these counts did not add new causes of action but instead asserted more details to support the breach of contract, wrongful foreclosure, and theft-by-foreclosure claims included in the first amended complaint filed in November 2005.  This court denied  the plaintiffs' motion for leave to amend to assert causes of action for promissory estoppel and reformation, which appeared for the first time in the proposed second amended complaint.  (Docket Entry No. 34).

The Veldekens' second amended complaint asserts causes of action for breach of contract, wrongful foreclosure, and theft on the basis of the following allegations:

- The foreclosure was wrongful because GE HFS's security interest in the Tidwell hospital was limited to Doctors Hospital's leasehold interest in the property.

- A condition precedent to GE HFS's security interest in the Tidwell hospital was that all loan proceeds must be utilized on the Tidwell hospital.

- A condition precedent to GE HFS's security interest in the Tidwell hospital was that the Tidwell hospital guaranty would be secondary to a primary guaranty obligation by HealthPlus.

- A condition precedent to GE HFS's security interest in the Tidwell hospital was that the Veldekens be kept informed.

- Material alterations to the Tidwell hospital loan documents void the Veldekens' guaranty obligations under those contracts.

- The Tidwell hospital had no right to foreclose because the demand letter from GE HFS was invalid.

- A condition precedent to GE HFS's security interest in the Tidwell hospital was a duty to act on breaches of covenants by Doctors Hospital.

- The Tidwell hospital only secured the construction loan up to $7 million, and no loan balance was due on the day of foreclosure.

- A condition precedent to GE HFS's security interest in the Tidwell hospital was ensuring that HealthPlus, in its role as a guarantor of the construction loan, was creditworthy.

- GE HFS's security interest in the Tidwell hospital was void due to supervening impracticability and/or frustration of purpose.

- A condition precedent to GE HFS's security interest in the Tidwell hospital was that conventional lending practices would be implied terms of the loan.

- GE HFS's security interest in the Tidwell hospital was void under Restatement (Third) of Suretyship & Guaranty, Sections 12 and 7, under which misrepresentations by an obligee void a guaranty.

> • GE HFS's security interest in the Tidwell hospital was
> void under Restatement (Third) of Suretyship &
> Guaranty, Section 12, under which misrepresentations by
> an third party void a guaranty.

In its motion, GE HFS argues that the undisputed facts entitle it to judgment as a matter of law that: GE HFS did not breach any contractual duty imposed by the parties' contracts; GE HFS's conduct did not cause the plaintiffs' damages because GE HFS did not cause Doctors Hospital to default on the loans; the alleged damages are unsupported and speculative; and the plaintiffs' claims are barred by several affirmative defenses, including lack of standing, limitations, waiver, and estoppel.  (Docket Entry No. 33 at 3-4).

In their cross-motion, the plaintiffs argue that GE HFS wrongfully foreclosed on the hospital and breached the Construction Loan contracts because: GE HFS did not perfect a security interest in the plaintiffs' fee-simple title to the hospital; the plaintiffs did not guarantee repayment of a loan in the amount demanded before foreclosure; GE HFS voided the plaintiffs' guaranty obligations by materially altering the Loan Agreement through the inserting of unauthorized cross-default terms in the amendments to the Loan Agreements, permitting the Construction Loan to be consolidated with other HealthPlus loans, and executing Loan Documents that disregarded the parties' expressed intentions for the disbursement and use of the loan proceeds; GE HFS disregarded Deed of Trust provisions requiring it to notify the plaintiffs of the borrowers' default; and GE HFS's failure to comply with the notice provisions contained in the Deed of Trust breached the Limited Guaranty and

the Deed of Trust and precluded GE HFS from relying on them.  (Docket Entry No. 37 at 7-8).[1]

The parties' asserted grounds for summary judgment and the arguments in opposition are examined below.

## II.      The Applicable Legal Standards

### A.      Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56.  The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact.  *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

If the burden of proof lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports the essential element or claim.  *Celotex*, 477 U.S. at 330.  The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case.  *Bourdeaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).  "An issue is material if its resolution could affect the

---

[1]  Although both parties purport to move for summary judgment in full, neither party has raised issues pertaining to Claims 10 or 11 of the second amended complaint.

outcome of the action." *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the pleading allegations. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim. *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004). This burden is not satisfied by "some metaphysical doubt as to the material facts," "conclusory allegations," "unsubstantiated assertions," or "only a scintilla of evidence." *Young v. Exxonmobil Corp.*, 155 Fed. Appx. 798, 800 (5th Cir. 2005). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Young,* 155 Fed. Appx. at 800. "Rule 56 'mandates the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Beard v. Banks,* 548 U.S. 521, 529 (2006) (quoting *Celotex*, 477 U.S. at 322).

### B.    Contract Interpretation

What a contract means, and whether a contract is ambiguous, are questions of law for the court. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). If the contract can be given a certain or definite legal meaning or interpretation, then it is not ambiguous, and a court should construe the contract as a matter of law. *SAS Inst., Inc. v. Breitenfeld*, 167 S.W.3d 840, 841 (Tex. 2005). Unambiguous contracts are enforced as written. *Heritage*, 939 S.W.2d at 121. A court should construe an unambiguous contract according to the plain meaning of its express wording, *Lyons v. Montgomery*, 701 S.W.2d 641, 643 (Tex. 1985), but at the same time "should construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served and need not embrace strained rules of interpretation which would avoid ambiguity at all costs," *Reilly v. Rangers Mgmt, Inc.*, 727 S.W.2d 527, 530 (Tex. 1987) (citing *Neece v. A.A.A. Realty Co.*, 322 S.W.2d 597, 602 (1959)). "A contract is construed against the drafting party only when it is ambiguous." *Chembulk Trading LLC,* 393 F.3d 550, 555 n. 6 (5th Cir. 2004) (citing *Empire Fire & Marine Ins. Co. v. Brantley Trucking, Inc.,* 220 F.3d 679, 681 (5th Cir.2000)). A contract is not ambiguous if "its language as a whole is clear, explicit, and leads to no absurd consequences, and as such it can be given only one reasonable interpretation." *Id.*

A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation. *Heritage*, 939 S.W.2d at 121. A court determines whether a contract is ambiguous by looking at the contract as a whole in light of the circumstances present when the parties entered the contract. *Universal Health Servs., Inc. v. Renaissance Women's Group, P.A.*, 121 S.W.3d 742, 746 (Tex. 2003). Parol evidence

is not admissible for the purpose of creating an ambiguity.  *See Universal C.I.T. Credit Corp.*

*v. Daniel*, 150 Tex. 513, 517, 243 S.W.2d 154, 157 (Tex. 1951); *Lewis v. E. Tex. Fin. Co.*,

146 S.W.2d 977, 980 (1941).

   In general, separate instruments or contracts executed at the same time, for the same

purpose, and in the course of the same transaction, may be considered as one instrument and

read and construed together.  *Jones v. Kelley,* 614 S.W.2d 95, 98 (Tex. 1981).  Even if the

parties executed the instruments or contracts at different times, documents pertaining to the

same transaction may be read together to ascertain the parties' intent.  *See Fort Worth Indep.*

*Sch. Dist. v. City of Fort Worth,* 22 S.W.3d 831, 840 (Tex. 2000); *Vinson v. Brown,* 80

S.W.3d 221, 231 (Tex. App.–Austin 2002, no pet.).

### C.     Guaranty Agreements

   "Texas courts apply the rule of *strictissimi juris* in interpreting guaranty agreements

to refrain from extending the guarantor's obligations by implication beyond the written terms

of the agreement."  *Vastine v. Bank of Dallas*, 808 S.W.2d 463, 464 (Tex.1991).  A guarantor

is discharged by the material alteration of the underlying debt between the principal debtor

and the creditor.   *Old Colony Ins. Co. v. City of Quitman*, 163 Tex. 144, 149, 352 S.W.2d

452, 455-56 (1961); *FDIC v. Attayi*, 745 S.W.2d 939, 944 (Tex. App.-Houston [1st Dist.]

1988, no writ). Guarantors are bound by the terms of the agreement they sign and are not

required to watch over the parties to the underlying debt to ensure that their performance

conforms to the terms of the contract creating that debt.  *Vastine,* 808 S.W.2d at 464; *Old*

*Colony*, 352 S.W.2d at 455.  The burden is on the guarantor seeking discharge from liability

21

to plead and prove alteration without his consent. *Austin Hardwoods, Inc. v. VandenBerghe*, 917 S.W.2d 320, 326 (Tex. App.-El Paso 1995, writ denied). To establish a material alteration, the guarantor must show: 1) the existence of a material alteration to the underlying contract; 2) lack of consent to the alteration; and 3) harm resulting from the alteration. *Frost Nat'l Bank v. Burge*, 29 S.W.3d 580, 588 (Tex. App.-Houston [14 Dist.] 2000, no pet.).

## III.   Analysis

### A.   Whether a Fee-Simple Security Interest was Created in the Tidwell Hospital

The plaintiffs argue that GE HFS's foreclosure of the Tidwell hospital was invalid because the Deed of Trust, originally and as amended, created a security interest only in the plaintiffs' leasehold interest in the property rather than on the fee-simple interest in the property. (Docket Entry No. 37 at 20-23). GE HFS counters that the Deed of Trust unambiguously conveyed a fee-simple security interest in the Tidwell hospital. (Docket Entry No. 33 at 13-16; Docket Entry No. 38 at 4-5; Docket Entry No. 40 at 9).

The Deed of Trust creates a security interest in the "Mortgaged Property," defined as "all of Grantor's present and future right, title and interest in and to" the Tidwell hospital. (Docket Entry No. 33, Ex. 1A at 6-7). The definitions section of the Deed of Trust defines "Grantor" as "the Leasehold Grantor together with its successors and permitted assigns, unless otherwise indicated herein." (*Id.*, Ex. 1A at 5). "Leasehold Grantor" is defined as "Doctors Hospital and its successors and permitted assigns"; the Veldekens are not included in this definition. (*Id.*, Ex. 1A at 6). The Veldekens are separately identified in the Deed of

Trust as the "Fee Grantor." (*Id.,* Ex. 1A at 4). The plaintiffs argue that under the "plain" language of the Deed of Trust, the security interest conveyed is only the interest held by the Leasehold Grantor – Doctors Hospital – so that the only security interest conveyed was the leasehold interest held by Doctors Hospital. The plaintiffs also point to internal memoranda by GE HFS's Credit Committee characterizing the security interest in the Tidwell hospital as a "leasehold mortgage" as evidence that this limited security interest is what the parties' intended. (Docket Entry No. 37, Exs. 14, 25).

The Deed of Trust, viewed as a whole and in conjunction with the other Loan Documents simultaneously executed, does not support the interpretation the plaintiffs urge. The Deed of Trust makes clear that two separate parties are conveying two separate interests: "(a) The Fee Grantor does hereby irrevocably grant . . . its *fee simple interest* in the "Mortgaged Property" and (b) "The Leasehold Grantor does hereby irrevocably grant . . . its *leasehold interest* in the Mortgaged Property." (Docket Entry No. 33, Ex. 1A at 2) (emphasis added). The plaintiffs' interpretation would make clauses (a) and (b) duplicative. The parties do not dispute that Doctors Hospital conveyed its leasehold interest in the Tidwell hospital. On the interpretation plaintiffs urge, the Veldekens conveyed the same interest. This is not a reasonable construction of the contract.

The plaintiffs' interpretation would also make the Deed of Trust linguistically strange. It would be redundant–and odd–for the Veldekens to "grant" a leasehold interest already held and granted by another, separate party to the agreement. It would also be nonsensical to "grant" a fee-simple interest in a leasehold. A fee simple is "[a]n interest in land that [is] the

23

broadest property interest allowed by law," while a leasehold interest is "[a] lessor's or lessee's interest under a lease contract."  BLACK'S LAW DICTIONARY 648-49, 910 (8th ed. 2004).

The plaintiffs' argument is based on the fact that the definitions section of the Deed of Trust defines "Grantor" as the "Leasehold Grantor," which is in turn defined as "Doctors Hospital," and that the "Mortgaged Property" in which a security interest is conveyed is defined as "all of Grantor's present and future right, title and interest in and to" the Tidwell hospital.  But the term "Doctors Hospital" is used elsewhere in the Deed of Trust to refer to *both* Doctors Hospital and the Veldekens, without an explicit statement that the defined terms are used differently than the definitions state.  The signature pages of the Deed of Trust designate both Doctors Hospital and the Veldekens as "Grantor."  (Docket Entry No. 33, Ex. 1A at 33-34).

The fact that the GE HFS credit committee memorandum refers to the guaranty as a "leasehold mortgage" does not support the plaintiffs' proffered construction.  The leasehold was part of the collateral, but it was not all of the collateral, as the plaintiffs urge.

Other Loan Documents confirm that the Deed of Trust unambiguously conveys a fee-simple security interest in the Tidwell hospital.  In the Lease Agreement between Doctors Hospital and the Veldekens, which paved the way for Doctors Hospital to obtain the Construction Loan from GE HFS, the Veldekens covenanted to "plac[e] any lien or mortgage on the [Tidwell hospital] securing indebtedness or obligations of Lessee in an initial amount of up to $7,000,000."  (*Id.*, Ex. 3A § 12.1).  In the Limited Guaranty Agreement between the

Veldekens and GE HFS, executed the same day as the Deed of Trust, the recitals define the "Mortgaged Property" as the "real property" on which the Tidwell hospital sits, "together with all improvements located and to be constructed thereon." (*Id.*, Ex. 2, recital A).

The plaintiffs' conduct confirms that they granted a fee-simple security interest in the Tidwell hospital. In a July 27, 1998 opinion letter, Patrick T. Sharkey, the attorney who represented the Veldekens in connection with the Construction Loan and the Loan Documents – including the Deed of Trust– characterized the Veldekens' participation in the Construction Loan as a "pledging of the fee simple title to" the Tidwell hospital. (*Id.*, Ex. 34). And the plaintiffs went through two years of litigation on the Deed of Trust and other Loan Documents relating to the Construction Loan before raising the interpretation they advance for the first time in their second amended complaint.[2]

In sum, the record reveals no contractual ambiguity, and therefore no triable fact issue, as what security interest was conveyed. GE HFS is entitled to summary judgment on this issue. The plaintiffs' cross-motion for summary judgment on this issue is denied.

**B.     Whether the Limited Guaranty Limits the Plaintiffs' Guaranty Obligations to $7 Million**

The plaintiffs argue that because the Limited Guaranty was never amended, their liability as guarantors is no more than the initial $7 million authorized in that document. (Docket Entry No. 37 at 23-24). The plaintiffs assert that each amendment to the Deed of

---

[2]These facts are not parol evidence. This court has already determined that the Deed of Trust is unambiguous on its face. These facts simply demonstrate that the plaintiffs acted, for nearly eight years, in conformance with the unambiguous meaning of the Deed of Trust.

Trust permitted increases to secured indebtedness only to levels authorized by "the Fee Grantor to the Beneficiary under the Limited Guaranty, if any." (Docket Entry No. 33 at Ex. 1B § 2; Ex. 1C § 1(d)). They argue that the Limited Guaranty had to be amended to increase the $7 million indebtedness limit. (Docket Entry No. 37 at 23). The plaintiffs point to recitals in each amended Deed of Trust referring to Limited Guaranty agreements "of even date herewith" to argue that because there were no amendments to the Limited Guaranty, no Limited Guaranty agreements of "even date" exist and these promises are illusory. (Docket Entry No. 33, Ex. 1B, recital E; Ex. 1C, recital E).

The unambiguous language of the Loan Documents defeats these arguments and this claim. The Limited Guaranty recites that "[t]he Borrower is indebted to the Lender in connection with a construction loan in the principal amount of Seven Million Dollars ($7,000,000) (as *increased*, modified, amended and restructured from time to time). . . ." (*Id.*, Ex. 2, recital B) (emphasis added). The Limited Guaranty permits such increases to principal indebtedness without an amendment to the Limited Guaranty itself. And the Veldekens expressly consented to increases in the principal loan amount in amendments to the Lease Agreement and the Deed of Trust. (*Id.*, Ex. 3B § 1; Ex. 3C § 2; Ex. 1B § 2; Ex. 1C § 2). The Limited Guaranty unambiguously permitted increases in the guaranty amount if and to the extent the principal indebtedness was increased. The Veldekens consented to these terms and to each of the increases in the loan amount.

GE HFS is entitled to summary judgment on this issue. The plaintiffs' cross-motion for summary judgment on this issue is denied.

**C.    Whether there were Material Alterations to the Loan Documents that Could Void the Veldekens' Obligations as Guarantors**

**1.    The Cross-Collateralization and Cross-Default Provisions**

The plaintiffs argue that cross-default provisions inserted into the amended Loan Agreements (*Id.*, Ex. 4B § 12; Ex. 4C § 3.4) "materially changed the underlying agreement that the Veldekens guaranteed, substantially increased their risk, and voided their guaranty obligations under the construction loan." (Docket Entry No. 37, at 9-11, 26-27). These provisions made the occurrence of an Event of Default under any other note between Doctors Hospital and GE HFS an Event of Default under the Construction Loan as well. (Docket Entry No. 33, Ex. 4B § 12; Ex. 4C § 3.4). The plaintiffs claim that they "were not a party" to the amended Loan Agreements, that they "never consented to [the cross-default] provisions," and that they never learned of these provisions until Doctors Hospital filed bankruptcy. (Docket Entry No. 37 at 10). The plaintiffs argue that the cross-default provisions violated the Limited Guaranty, which required the Veldekens' consent to "increases in the amount of credit" and specified that the Veldekens' guaranty "applie[d] only to the Loan and not to any other indebtedness" of Doctors Hospital to GE HFS. (Docket Entry No. 37 at 26; Docket Entry No. 33, Ex. 2 ¶¶ 4, 6).

The plaintiffs also contend that the Tidwell hospital was pledged – without the Veldekens' permission – as collateral as part of the Parkway hospital acquisition loan granted by GE HFS to HealthPlus. (Docket Entry No. 37 at 10). The plaintiffs refer to a "Parkway Acquisition Note," (*id.*), but do not provide a record citation to this Note. Although a court

27

is not required to ferret through the record to locate summary judgment evidence for which the parties do not provide a citation,[3] this court did search the record and could not locate this Note. The plaintiffs also cite an internal memorandum to the GE HFS Credit Committee that describes the Parkway acquisition loan as being "cross-collateralized" with the Tidwell hospital. (*Id.,* Ex. 14 at 1).

GE HFS counters that the cross-default provisions in the amended Loan Agreements did not require the Veldekens' additional consent because those provisions did not increase the amount of credit secured by the Veldekens' Deed of Trust and Limited Guaranty. GE HFS characterizes the cross-default provisions as "modifications" of credit terms and argues that the Limited Guaranty expressly authorized such modifications without requiring the Veldekens' additional consent. (Docket Entry No. 38 at 5; Docket Entry No. 33, Ex. 2 ¶ 4). GE HFS denies that any cross-collateralization occurred, urging that "the Tidwell hospital was not pledged as collateral for any loans other than" the Construction Loans. (Docket Entry No. 40 at 2-3, 9-10; Docket Entry No. 33, Ex. 26 ¶ 7). GE HFS also argues that the plaintiffs' argument is moot because GE HFS "foreclosed *solely* on defaults relating to" the Construction Loans. (Docket Entry No. 40 at 3).

---

[3] Rule 56 does not obligate this court to search for evidence to support a party's motion for, or opposition to, summary judgment. *See Ragas v. Tenn. Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir. 1998) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment."); *Nicholas Acoustics & Specialty Co. v. H & M Constr. Co., Inc.,* 695 F.2d 839, 846-47 (5th Cir.1983) ("Judges are not ferrets!"); *Albrechtsen v. Bd. of Regents,* 309 F.3d 433, 436 (7th Cir.2002) ("'Judges are not like pigs, hunting for truffles buried in' the record." (quoting *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991))).

The defendants' assertion that the cross-default provisions did not increase the amount of credit secured by the Veldekens' Deed of Trust and Limited Guaranty is not persuasive. When the Loan Agreement was amended to make a default under any of HealthPlus's contracts with GE HFS an Event of Default under the construction Loan Agreement, the Tidwell hospital became collateral for obligations that exceeded the debt identified in the Veldekens' Deed of Trust. The cross-default provisions appear to be material alterations to which the Veldekens did not specifically consent.

To create a fact issue as to whether the guaranty agreement is void because of material alteration, however, the plaintiffs must raise a fact issue as to whether the alteration resulted in harm. *Frost Nat'l Bank*, 29 S.W.3d at 588; *Austin Hardwoods*, 917 S.W.2d at 326. GE HFS argues, and the plaintiffs do not dispute, that the foreclosure was only on the Tidwell hospital and did not result from any default by HealthPlus on its other contracts with GE HFS. (*Id.* at 3). The undisputed evidence in the summary judgment record does not support an inference that the addition of the cross-default provisions caused the plaintiffs harm.

GE HFS is entitled to summary judgment on this issue. The plaintiffs' cross-motion for summary judgment on this issue is denied.

### 2.   The Loan Consolidation

The plaintiffs argue that the agreement between HealthPlus and GE HFS to consolidate the Tidwell hospital Construction Loan with the Parkway hospital acquisition loan and other HealthPlus loans "effectively increased the amount of the construction note." The plaintiffs argue that the Limited Guaranty required the Veldekens' consent to this loan

consolidation.  (Docket Entry No. 37 at 11-12, 26-27; Docket Entry No. 33, Ex. 2 ¶ 4).  The

Veldekens claim not to have consented to this consolidation or even to have learned of it

until Doctors Hospital filed for bankruptcy.  (Docket Entry No. 37 at 12).  In support of their

contention that the consolidation changed the amount of credit secured and therefore required

the Veldekens' consent, the plaintiffs cite a September 16, 1999 letter from GE HFS's Dean

Graham to W. McPherson Burt, the CFO of HealthPlus.  (*Id.*, Ex. 17).  Graham wrote:

> Upon review of the documentation for the Construction Note,
> and the Limited Guaranty of the Veldekens in particular, we
> have determined that the execution of one consolidated note
> would probably require the consent of the Veldekens since we
> would technically be increasing the original Construction Note.
> We understand that you are currently negotiating with the
> Veldekens to increase the amount secured by the Tidwell Deed
> of Trust, but that you have not yet reached a definitive
> agreement.  In light of the pending negotiations, it would
> probably not be helpful at this time to request their consent to
> the consolidation of the term debt.

(*Id.*).  In his deposition, Burt testified that the consolidation "would have required the

Veldekens' consent ultimately."  (Docket Entry No. 33, Ex. 6 at 231:25-232:16).

GE HFS responds that the September 16, 1999 letter shows that "the borrower was

'working on' an agreement to secure plaintiffs' consent," and that this consent "was later

secured after the 1999 mediation and amended deed of trust."  (Docket Entry No. 40 at 10).

GE HFS also argues that the Veldekens' consent was unnecessary, as "[p]laintiffs have not

proven that material modifications were made." (*Id.*).

The record contains no evidence that the Veldekens' consent to the loan consolidation

was obtained.  Neither exhibit GE HFS cites indicates such consent.  The Memorandum of

Agreement signed after the 1999 mediation, and the Second Amendment to Deed of Trust executed to reflect the Memorandum of Agreement, are silent on consolidation.

The summary judgment record does not allow a determination as to whether, as a matter of law, the Veldekens' consent to the loan consolidation was necessary under the Limited Guaranty.  Whether such consent was required appears to depend on aspects of the loan consolidation not documented in the record.  If, for example, the consolidation terms allowed repayments under the Construction Loan to be applied, in full or in part, to other loans in the consolidated bundle, then the amount of credit secured by the Veldekens' guaranty would be increased, and the Veldekens' consent would be required.  If, on the other hand, the consolidation terms required that repayments under the Construction Loan be applied only to pay down that loan, then the consolidation would merely modify the terms of the credit secured by the Veldekens' guaranty rather than increase the amount, and the Veldekens' consent would not be required.   The record does not contain the consolidated note that is necessary to resolve this issue.

The record does contain evidence suggesting that the terms of the consolidated loan increased the amount secured by the Veldekens' guaranty.  Graham and Burt both testified in their depositions that they believed the Veldekens' consent would be required.  Burt's deposition testimony also indicates the possibility of commingling of the consolidated debt. Burt admitted "not recall[ing] how all of this debt was cobbled together and what its original individual pieces were," and to not being able to differentiate "what's sitting in the Tidwell pot and what's sitting in the Parkway Pot."  (Docket Entry No. 37, Ex. 18 at 191:15-17;

31

189:12-13).  But other record evidence suggests that the consolidated loan terms did not require the Veldekens' consent.  Burt testified that the consolidation was done only for administrative purposes, to make it "simpler for the [Tidwell] hospital to look at one document and to determine if it's in compliance with the loan rather than hate to look through a whole bunch of different documents with different maturity dates," and that "it [wa]s not bad for the Veldekens in any way."  (Docket Entry No. 33, Ex. 6 at 233:1-12).

This court cannot conclude, based on the record, whether the consolidated loan constituted a material alteration of the construction loan.  Summary judgment is denied on this issue.

### 3.    The Application of Construction Loan Funds to the Parkway Acquisition Note

The plaintiffs assert that GE HFS materially altered the Construction Loan terms by executing a side agreement under the Additional Term Note that allowed some of the loan proceeds to be used to pay down the Parkway hospital acquisition note.  (Docket Entry No. 37 at 27-30).  The plaintiffs argue that applying Construction Loan proceeds to the Parkway note was improper, given that "the Veldekens only consented to liens against their property to secure funds for the improvement of their property."  (*Id.* at 28).  The plaintiffs include among their exhibits a letter dated November 22, 1999 from B. John Lange III, counsel to HealthPlus, to Diane Pennington, counsel for  GE HFS.  In this letter, Lange states that he will have the Veldekens agree to guaranty an additional $6 million loan and then have Doctors Hospital immediately apply $3 million of that loan toward repaying the $7 million Parkway acquisition note.  (*Id.*, Ex. 20).  This arrangement is formalized in a side letter to

32

the Additional Term Note, in which McPherson of HealthPlus instructs GE HFS to apply $3 million of the $6 million loan to "prepayment of principal outstanding" under the Parkway acquisition note.  (*Id.*, Ex. 19, exhibit B).

Despite the seeming conflict between the application of $3 million in Construction Loan funds to the Parkway note and the requirement in the Loan Agreement, originally and as amended, that Construction Loan funds be used "solely and exclusively" for construction projects at the Tidwell hospital  (Docket Entry No. 33, Ex. 4A § 4.13; Ex. 4B, Ex. 4C), this court grants GE HFS's motion and denies the plaintiffs' motion on this issue.  The First Amendment to Lease Agreement specifies that loan funds would be used "for, and only for, the payment or *reimbursement of* those costs and fees" approved by GE HFS "legitimately relating to the cost of constructing and/or renovating the improvements in, on and about" the Tidwell hospital.  (*Id.*, Ex. 3B § 3).  GE HFS and HealthPlus carefully structured the $6 million Additional Term Note to fit within those parameters.  (Docket Entry No. 37, Ex. 20).  Lange wrote:  "As you will note, any increase of the lien may only be accomplished if funds are actually expended on the Doctors Hospital Tidwell campus, either as reimbursement of prior construction costs or as funding of new construction costs."  (*Id.*)  The $3 million at issue was structured as reimbursement to Doctors Hospital for construction costs on the Tidwell hospital that it had paid using equity.  (*Id.*).  Once reimbursed, Doctors Hospital would be free to use the $3 million as it chose.  (*Id.*).

The plaintiffs have not argued, and the record contains no evidence, that Doctors Hospital was not actually entitled to $3 million in reimbursement for funds expended on

construction at the Tidwell hospital.  The transaction does not violate the Construction Loan documents.

GE HFS is entitled to summary judgment on this issue.  The plaintiffs' cross-motion for summary judgment on this issue is denied.

### D.   Whether GE HFS Had or Breached Certain Contractual Duties Under the Loan Agreement

#### 1.   The Claim that GE HFS had a Duty to Police the Spending of Loan Funds

The plaintiffs assert that GE HFS had a contractual duty to ensure that Construction Loan funds were spent only on construction at the Tidwell hospital.  The plaintiffs allege that GE HFS violated this duty by "disburs[ing] loan proceeds to [Doctors Hospital] that were used for purposes other than construction at Tidwell in total disregard of the parties' clear agreement."  (Docket Entry No. 37 at 28).  The plaintiffs cite findings by the bankruptcy court that numerous projects budgeted under the Loan Agreement were not completed and that the completed construction at the Tidwell hospital was consistent with an expenditure of approximately $4.5 million.  (*Id.* at 3 n.1; Docket Entry No. 33, Ex. 7 at 5:2-25).  The plaintiffs also cite the report of their financial expert, Jeffrey A. Compton, who indicated that, although he found nothing "materially inconsistent" with the expenditure of $18 million on the property, he could verify only that Doctors Hospital paid "in excess of $11 million for renovation and construction" at the Tidwell hospital between 1998 and 2002.  (Docket Entry No. 37 at 29; Ex. 28 at 2).  The plaintiffs also ask this court to draw an adverse inference

from the fact that GE HFS claims to have lost the file pertaining to the disbursement and use of the Construction Loan proceeds.  (*Id.* at 28).

GE HFS argues that it had no duty to police the spending of Construction Loan funds. GE HFS argues that the Limited Guaranty "imposes on plaintiffs, not GE HFS, the responsibility to keep 'informed' and disclaims any duty on GE HFS to 'advise' them of what it knows."  (Docket Entry No. 33 at 9; Ex. 2 ¶ 16).  GE HFS argues further that the plaintiffs were uniquely well-positioned to police the spending of Construction Loan funds. As limited partners of Doctors Hospital, the plaintiffs had an office in the administrative area of the hospital, had access to Doctors Hospital's officers, and, as members of the Tidwell hospital's Governing Board, were able to attend Governing Board meetings.  (*Id.* at 10; Ex. 6 at 246:3-247:18).  Under the 1999 Memorandum of Agreement, the plaintiffs also obtained the right to monitor the Tidwell hospital's books and audit its financial records.  (*Id*. at 10; Ex. 8 ¶¶ 6, 7, 9).

The plain language of the Limited Guaranty leads to the conclusion that as a matter of law, GE HFS had no duty to the plaintiffs to police Doctors Hospital's spending of Construction Loan funds.  The Limited Guaranty in fact allocated the monitoring role to the plaintiffs.  Because this court concludes that GE HFS had no duty to police Doctors Hospital's spending, it need not consider whether all the Construction Loan funds were spent on the Tidwell hospital or whether an adverse inference from the inability to locate the Construction Loan file is appropriate.

GE HFS is entitled to summary judgment on this issue.  The plaintiffs' cross-motion for summary judgment on this issue is denied.

### 2.    The Claim that GE HFS Had a Duty to Police the Creditworthiness of Doctors Hospital and HealthPlus

GE HFS argues that a straightforward textual analysis defeats the plaintiffs' claim that GE HFS owed them a contractual duty to police the creditworthiness of HealthPlus and Doctors Hospital.  GE HFS points out that under the plain language of the Limited Guaranty, the Veldekens "waive[d] notice of . . . the state of indebtedness of [Doctors Hospital] at any time."  (*Id.*, Ex. 2 ¶ 4).  Under the Limited Guaranty, the plaintiffs also explicitly assumed the duty of policing the creditworthiness of Doctors Hospital and HealthPlus and agreed that GE HFS would have no such duty:

> Guarantor hereby assumes responsibility for keeping itself informed of the financial condition of [Doctors Hospital], and any and all endorsers and/or other guarantors of any instrument or document evidencing all or any part of the Loan and of all other circumstances bearing upon the risk of nonpayment of the Loan or any part of the Loan that diligent inquiry would reveal, and Guarantor hereby agrees that, except as provided in the Mortgage, [GE HFS] shall have no duty to advise Guarantor of information known to [GE HFS] regarding such condition or any such circumstances.

(*Id.*, Ex. 2 ¶16).

This court agrees that the plain language of the Limited Guaranty controls.  GE HFS did not owe the plaintiffs a contractual duty to police the creditworthiness of Doctors Hospital and HealthPlus.  GE HFS is entitled to summary judgment on this issue.  The plaintiffs' cross-motion for summary judgment on this issue is denied.

### 3.     The Claim that GE HFS Had a Duty to Pursue HealthPlus Before the Plaintiffs

GE HFS argues that textual analysis should also defeat the plaintiffs' claim that the Limited Guaranty was to be secondary to the guaranty provided by HealthPlus and North Houston and that GE HFS had a duty to pursue the HealthPlus and North Houston first in the event of default.  (*Id.* at 13).

This court agrees.  The Lease Agreement between the Veldekens and HealthPlus did provide that Doctors Hospital would "use its commercially reasonably [sic] best efforts to obtain its lenders agreement . . . that such lender pursue its remedies against HealthPlus and [Doctors Hospital] before foreclosing on its liens on" the Tidwell hospital (*id.*, Ex. 3A § 12.5(a)), but the Construction Loan Documents, which were executed seven months after the Lease Agreement, reflect no such priority.  Instead, the Deed of Trust gives GE HFS "the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this instrument."  (*Id.*, Ex. 1A § 20).  Doctors Hospital promised under the Lease Agreement to use its "best efforts" to obtain the lender's agreement to make the Veldekens secondary guarantors on the loan, but the later-drafted Construction Loan documents reflect that these best efforts failed.  The Veldekens gave explicit consent to be treated as primary guarantors of the Construction Loan by signing loan documents–the Limited Guaranty and Deed of Trust–that were silent as to priority.

GE HFS is entitled to summary judgment on this issue.  The plaintiffs' cross-motion for summary judgment on this issue is denied.

### 4.     The Claim that GE HFS Had a Duty to Apply Loan Payments to the Principal

A similar analysis governs the plaintiffs' claim that GE HFS was required first to apply payments under the Construction Loan to reducing the principal due under the loan (and thereby to reducing the amount secured by the lien on the Tidwell hospital).  Doctors Hospital promised under the Lease Agreement to use its "best efforts" to obtain the lender's agreement to "apply the first payments of principal paid by [Doctors Hospital] to the reduction of the secured liens on the Leased Assets." (*Id.*, Ex. 3A § 12.5(b)).  But this promise was superseded by the Construction Loan Documents, which do not require that payments be applied to principal.  The Deed of Trust, signed by the Veldekens, gives GE HFS full discretion in determining how to apply loan payments:

> If at any time [GE HFS] receives, from [Doctors Hospital] or otherwise, any amount applicable to the Indebtedness which is less than all amounts due and payable at such time, then [GE HFS] may apply that payment to amounts then due and payable in any manner and in any order determined by [GE HFS], in [GE HFS's] sole discretion.

(*Id.*, Ex. 1A § 5).

GE HFS is entitled to summary judgment on this issue.  The plaintiffs' cross-motion for summary judgment on this issue is denied.

### 5.     The Claim that GE HFS Had a Duty to Provide Notice of Events of Default

The plaintiffs argue that GE HFS breached a contractual duty to inform the Veldekens of Events of Default by Doctors Hospital under the Loan Agreement.   (Docket Entry No. 37 at 17-18, 30-32).  The plaintiffs complain that before the Doctors Hospital bankruptcy,

"[t]here should have been a continuous stream of notices of events of defaults beginning in at least 2003."  (*Id.* at 31).  They point to the requirement in the Deed of Trust that the Veldekens receive "the same written notice of default and right to cure which [GE HFS] provides [Doctors Hospital] in the case of an Event of Default."  (Docket Entry No. 33 at 12; Ex. 1A § 15(o)).  The plaintiffs argue that GE HFS circumvented this requirement by not reducing many of its communications with HealthPlus or Doctors Hospital to writing.  (Docket Entry No. 37 at 17 & n. 10).  The plaintiffs also posit that written communications of default might be contained in the construction loan file that GE HFS cannot locate to produce in discovery.  (*Id.*).

GE HFS argues that it acted in accordance with the Deed of Trust by giving the "plaintiffs and Doctors Hospital identical written demands to cure prior to foreclosure," and asserts that no other written notices of default were given.  (Docket Entry No. 40 at 7).  GE HFS also points to language in the Deed of Trust indicating that GE HFS could, at its option, forbear from exercising its rights in an Event of Default and therefore avoid informing either party of a default.  (*Id.* at 12; Ex. 1A § 17).

To create a fact issue as to GE HFS's alleged failure to provide earlier notices of default, the plaintiffs must raise a fact issue as to whether this failure resulted in harm.  *Frost Nat'l Bank*, 29 S.W.3d at 588; *Austin Hardwoods*, 917 S.W.2d at 326.  The plaintiffs have not done so here.  The plaintiffs had oversight privileges at the Tidwell hospital and were in a position to assess the hospital's financial condition.  Because this court concludes that no fact issue has been raised as to harm, it need not consider whether all the Construction Loan funds

were spent on the Tidwell hospital or whether an adverse inference from the inability to locate the Construction Loan file is appropriate.

GE HFS is entitled to summary judgment on this issue.  The plaintiffs' cross-motion for summary judgment on this issue is denied.

### E.    Whether Wrongful Foreclosure Occurred

### 1.    Whether the Foreclosure Itself was Lawful

The plaintiffs' wrongful foreclosure claims are premised, in large part, on the breach of contract claims.  (Docket Entry No. 37 at 32-34; Docket Entry No. 42).  GE HFS urges that, at a minimum, these wrongful foreclosure claims should succeed or fail with the contract claims they track. (Docket Entry No. 40 at 7).  GE HFS argues in the alternative that these wrongful foreclosure claims should be dismissed as duplicative of the breach of contract claims.  (*Id.* at 8-9).  GE HFS cites *In re Keener*, 268 B.R. 912, 921-22 (Bkrtcy. N.D. Tex. 2001), in which the trustee asserted both wrongful foreclosure and breach of contract causes of action "aris[ing] from a breach of deed of trust."  The plaintiffs did not allege defects in the foreclosure or the foreclosure sale.  Instead, the plaintiffs alleged that the subsequent disbursement of foreclosure proceeds violated the deed of trust.  *Id.* at 922.  The court characterized the trustee's wrongful foreclosure theory as "misplaced," dismissed the wrongful foreclosure cause of action, and proceeded to analyze the claims under the breach of contract theory.  *Id.*

The relationship between the breach of contract claims and the wrongful foreclosure claims in the present case is similar to that in *Keener.*  The plaintiffs have cited no legal or

factual basis to retain the wrongful foreclosure claims as well as the breach of contract claims, insofar as the wrongful foreclosure claims are based on breach of the parties' contracts.  The court grants summary judgment to GE HFS and denies summary judgment to the plaintiffs on this issue.  The wrongful foreclosure claims based on breach of contract are dismissed.

### 2.        The Demand Letter and Subsequent "Chilled Bidding"

Claim 6 of the second amended complaint is the only claim in that complaint that alleges an issue with the foreclosure procedure itself.  Claim 6 alleges that the $15.5 million demand letter GE HFS made to the Veldekens before foreclosure "failed to comply with the law" and named an "excessive dollar amount."  (Docket Entry No. 46 ¶ 99).  Claim 6 does not explain how the letter was not in compliance with the law, and does not directly explain why the dollar amount demanded was excessive.  Additional paragraphs of the complaint suggest that the plaintiffs believed the dollar amount to be excessive because the Tidwell hospital ultimately sold at auction for only $2.5 million.  (*Id.* ¶ 35).[4]

The plaintiffs also assert a "chilled bidding" theory, arguing that the foreclosure was unlawful because "[w]hen the Plaintiffs offered to purchase Tidwell before the foreclosure sale, GE repeatedly refused to negotiate, and stated that it needed at least $15.5 million for the property."  (Docket Entry No. 37 at 33).  The plaintiffs present as evidence a letter dated October 28, 2005 from Charles Veldekens to GE HFS.  In this letter, Charles Veldekens states that he is working to obtain funding to purchase the Tidwell hospital note, and offers to

---

[4]The second amended complaint also suggests that the plaintiffs believed the dollar amount to be excessive because they denied executing a guaranty to cover that full amount (*id.* ¶ 117), but because this court has concluded that theory is based in breach of contract, the plaintiffs' wrongful foreclosure claim based on this theory is denied.

"open[ ] the bidding at $8 million for GE notes for both Tidwell and Parkway hospitals." (*Id.*, Ex. 2, exhibit F). The plaintiffs assert that GE HFS's conduct in refusing preforeclosure offers of less than $15.5 million discouraged the Veldekens from bidding on the property at public auction.

Insofar as the plaintiffs' wrongful foreclosure claim is premised on the theory that the foreclosure procedure was defective because the property sold for $2.5 million, vastly less than the $15.5 million that GE HFS demanded in the notice of default, this claim fails. "[I]nadequacy of the consideration received on the foreclosure sale cannot alone invalidate an otherwise valid deed of trust nonjudicial foreclosure on real estate." *Savers Fed. Sav. & Loan Ass'n v. Reetz,* 888 F.2d 1497, 1502 (5th Cir. 1989). Under Texas law, "in order for inadequacy of consideration to have that effect, there must also be some irregularity in the foreclosure which caused or contributed to cause the real property to be sold for a grossly inadequate price." *Id.* The second amended complaint does not plead any irregularity in the foreclosure procedure itself.

The plaintiffs' summary judgment briefing raises an argument about irregularity in the foreclosure procedure – chilled bidding – that arguably (though by no means certainly) might satisfy the standard for chilled bidding. *See Pentad Joint Venture v. First Nat'l Bank of La Grange,* 797 S.W.2d 92, 96 (Tex. App.–Austin 1990, no writ) ("Texas law recognizes that a mortgagee is under a duty to avoid affirmatively deterring third party bidding by acts or statements made before or during the foreclosure sale."). But because this chilled bidding claim is not raised in the second amended complaint, and because the plaintiffs can show no

good reason for delay in pleading this claim, as required by Rule 16(b), the plaintiffs' chilled bidding theory does not save Claim 6 from dismissal.

Summary judgment is granted to GE HFS and denied to the plaintiffs on this issue, and Claim 6 of the second amended complaint is dismissed.

### F.    Whether GE HFS is Liable Under the Texas Theft Liability Act

Along with breach of contract and wrongful foreclosure, the plaintiffs seek relief under the Texas Theft Liability Act ("TTLA") for each claim in the second amended complaint. TEX. CIV. PRAC. & REM. CODE ANN. §§ 134.001, et seq. (Vernon 2005). The TTLA imposes civil liability for theft, defined in the statute as "unlawfully appropriating property or unlawfully obtaining services" as described in various sections of the Texas Penal Code, including Section 31.03, which provides, in relevant part, that "[a] person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property. Appropriation is unlawful if it is without the owner's effective consent." *Id.* at § 134.00(2); TEX. PENAL CODE ANN. § 31.03 (Vernon Supp. 2008). GE HFS seeks summary judgment on the issue of its liability under the Act, arguing that "this is nothing more than a contract dispute," and that the plaintiffs "have not even tried to prove criminal intent under Tex. Penal Code Ann. §31.03(a)." (Docket Entry No. 40 at 13).

GE HFS's motion is moot as to the claims in the second amended complaint that this court has already dismissed. As to the claims that remain–those premised on alleged material alteration of the plaintiffs' guaranty obligations by consolidating the construction loan with

other loans–GE HFS's motion for summary judgment as to the TTLA cause of action is denied.

The plaintiffs allege that GE HFS consolidated the Construction Loan with other unrelated loans and permitted payments on the Construction Loan to be applied to these other loans.  (Docket Entry No. 47 ¶¶ 26, 90).  According to the plaintiffs, the consolidation increased the amount of indebtedness secured by the Limited Guaranty and Deed of Trust, which in turn made default and foreclosure more likely and increased the resulting deficiency. (*Id.*).  The record raises a fact issue as to whether this sequence of events occurred, and whether, if it did, there was an intent to deprive the plaintiffs of their property "without their effective consent."  TEX. PENAL CODE § 31.03.  GE HFS's assertion that the TTLA cannot apply to claims grounded in breach of contract is unpersuasive.  *See Corporate Link, Inc. v. Fairbanks Capital Corp.*, 2005 WL 770564, at *7 (N.D. Tex. Apr. 4, 2005) (noting availability of TTLA remedies "in cases where an express contract exists"); *BP Prods. North Am. Inc. v. Int'l Maint. Corp.*, 2005 WL 5976553, at *8 (S.D. Tex. May 27, 2005) (denying summary judgment to dismiss TTLA claims premised on breach of service contract).  The present record does not permit this court to grant GE HFS's motion for summary judgment on the TTLA claims.

### G.    Causation and Damages

GE HFS argues that the "plaintiffs cannot prove that alleged breaches by GE HFS caused the damages that plaintiffs seek, which is an element of any contract claim."  (Docket Entry No. 33 at 16).  GE HFS asserts that "loss of the property was through an unconditional

foreclosure, due to admitted defaults by an insolvent borrower.  Plaintiffs have no competent evidence that GE HFS caused Doctors Hospital to default, leading to the foreclosure."  (*Id.*) GE HFS makes a similar argument as to damages.

GE HFS's causation and damages arguments need not be analyzed with respect to the claims in the second amended complaint that this court has already dismissed.  As to the claims that remain–those premised on alleged material alteration of the plaintiffs' guaranty obligations by consolidating the construction loan with other loans–GE HFS's motion for summary judgment based on lack of causation or damages is denied.  If GE HFS participated in a consolidation note under which payments on the construction loan were directed to other loans in the consolidated bundle, that may have materially impacted the level of Doctors Hospital's indebtedness under the Construction Loan, which would in turn have impacted the amount the Veldekens guaranteed.  The present record does not permit this court to grant GE HFS's motion for summary judgment on the issue of causation or damages for the consolidation-related claims.

### H.    Affirmative Defenses

#### 1.    Standing

GE HFS asserts that the Veldekens lack standing to pursue this suit because they transferred the property to the coplaintiff, Tidwell Properties, Inc., through warranty deed in 1999, and therefore "did not hold title or lose anything personally."  (Docket Entry No. 33 at 19).  In the 2006 Doctors Hospital bankruptcy proceedings, Judge Bohm took "judicial notice of the Texas Secretary of State Business Organization records, which indicate that Mr.

Veldekens is the registered agent and sole officer and director of Tidwell Properties, Inc." *In re Doctors Hospital 1997 L.P.,* 351 B.R. 813, 822 (Bkrtcy S.D. Tex. 2006). Tidwell Properties is a "closely held corporation" under Texas law. TEX. BUS. CORP. ACT, Art. 5.14(L)(2)(a). The Business Corporations Act provides that "a derivative proceeding brought by a shareholder of a closely held corporation may be treated by a court as a direct action brought by the shareholder for his own benefit." *Id.*, Art. 5.14(L)(1)(a). The Veldekens, as the sole shareholder and sole shareholder's spouse in a closely held corporation, may continue as direct participants in this action.

Summary judgment is denied to GE HFS on this affirmative defense.

### 2.      Statute of Limitations

GE HFS asserts that the four-year statute of limitations applicable to breach of contract claims in Texas should bar the plaintiffs' claims. (Docket Entry No. 33 at 19-20). This motion is moot as to the claims in the second amended complaint that this court has already dismissed. As to the claims that remain–those premised on alleged material alteration of the plaintiffs' guaranty obligations by consolidating the Construction Loan with other loans–GE HFS's motion to dismiss on limitations grounds is denied.

More than four years elapsed between July 1999, when the consolidation allegedly occurred, and March 2005, when the plaintiffs first filed suit on the claim. The plaintiffs argue that the "discovery rule" applies to toll the statute of limitations. Under Texas law, in a breach of contract case, the discovery rule tolls the statute of limitations until the plaintiff "discover[ed], or through the exercise of reasonable diligence should have discovered," the

breach, and the "the injury incurred [wa]s inherently undiscoverable" at breach. *Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 313 (Tex. 2006).  In federal court actions applying Texas statute of limitations law, a plaintiff need not specifically plead the discovery rule, but rather need only plead sufficient facts to put the defendant on notice of the theories on which the complaint is based. *Colonial Penn Ins. Co. v. Market Planners Ins. Agency, Inc.*, 1 F.3d 374, 376 (5th Cir. 1993).  The plaintiffs met this pleading requirement in the second amended complaint.  (Docket Entry No. 46 ¶¶ 26, 90).

GE HFS bears the trial burden of proving its statute of limitations affirmative defense and negating the applicability of the discovery rule. *See In re Enron Corp. §., Deriv. & "E.R.I.S.A." Litig.*, 490 F. Supp. 2d 784, 805 (S.D. Tex. 2007) (citing *Childs v. Haussecker*, 974 S.W.2d 31, 44 (Tex.1998)).  When a party moves for summary judgment on an issue for which it has the burden of persuasion at trial, "the burden of establishing the absence of an issue of fact falls squarely to the movant."  Edward J. Brunet & Martin H. Redish, Summary Judgment: Federal Law and Practice § 5.8 (3d ed. 2006).

GE HFS has not met its burden of establishing the absence of a fact issue on its limitations affirmative defense.  The plaintiffs claim that they "were unaware of this consolidation . . . until the bankruptcy filing." (Docket Entry No. 37 at 12, 36).  GE HFS has not presented evidence that plaintiffs were aware, or through reasonable diligence should have been aware, of the consolidation agreement.  Although there is evidence showing that the Veldekens had access to the Doctors Hospital books and records after the 1999 mediation, there is also evidence that in 2001 and 2003, the Veldekens protested the lack of access to the

47

records that HealthPlus provided.  (Docket Entry No. 33, Exs. 24, 30).  As guarantors, the Veldekens had no obligation under Texas law to "watch over the contracting parties to see that performance conform[ed] to the terms of the contract." *Vastine*, 808 S.W.2d at 464.  The present record is inadequate to grant GE HFS's motion for summary judgment on the basis of limitations.

### 3.    Waiver and Estoppel

GE HFS moves for summary judgment on the affirmative defense of waiver estoppel, arguing that the plaintiffs "knowingly waived any claim that they did not convey a fee simple lien" by failing to raise that argument in the first two years of this litigation.  (Docket Entry No. 33 at 21-23).  This motion is moot, as this court has already determined that the Loan Documents conveyed a fee-simple interest in the Tidwell hospital.

### I.    The Motion to Strike Portions of Charles Veldekens' Summary Judgment Affidavit

GE HFS has moved to strike paragraphs 8, 11, 12 and 13 of the affidavit of Charles Veldekens, (Docket Entry No. 37, Ex. 2), arguing that these paragraphs offer "speculative and incompetent testimony" that contradict Mr. Veldekens's prior deposition testimony. (Docket Entry No. 38 at 2, 7-9; Docket Entry No. 44).  GE HFS argues that these portions constitute a "sham affidavit."

The rule against sham affidavits gives the court discretion, at the summary judgment stage, to disregard affidavits "that are inconsistent with prior deposition testimony [where] the affiant does not account for the inconsistency." *Holden v. Illinois Tool Works, Inc.*, No. 06-cv-3958, 2007 WL 4591752, at *1 (S.D. Tex. Dec. 27, 2007) (citing *Tex. Sales and Mktg.,*

*Inc. v. Distinctive Appliances, Inc.*, No. 05-cv-3555, 2007 WL 399292, at *6 (S.D. Tex. Jan. 31, 2007)).

This court's findings of fact did not rely on any of the paragraphs GEHFS moves to strike. The motion to strike is denied as moot.

## IV.   Conclusion

This court denies summary judgment as to the claims based on the consolidation of the HealthPlus loans, including the claims based on whether the consolidation caused the plaintiffs' injury, whether the consolidation resulted in damages to the plaintiffs, and whether the claims based on the consolidation are timely. On all other claims, GE HFS's motion for summary judgment is granted and the plaintiffs' motion for summary judgment is denied. The motion to strike the affidavit of Charles Veldekens is denied as moot.

SIGNED on September 24, 2008, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

49